**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**DENZIL LOUIS DAVIS, JR.,**

                Plaintiff**,**

**v.**

                             **CIVIL ACTION NO.: 3:16-CV-126
(CHIEF JUDGE GROH)**

**NANCY A. BERRYHILL,
Acting Commissioner of Social Security,**

                Defendant.

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

On August 29, 2016, Plaintiff Denzil Louis Davis Jr. ("Plaintiff"), by counsel Jan Dils, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security[1] ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1).  On November 4, 2016, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings.  (Answer, ECF No. 6; Admin. R., ECF No. 7). On December 5, 2016, and December 27, 2016, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment.  (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 9; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 11). Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and

---

[1] After this suit was filed, but before this Order was entered, Nancy A. Berryhill replaced Carolyn W. Colvin as the Acting Commissioner of Social Security. Accordingly, pursuant to Rule 25(d), Fed. R. Civ. P., and 42 U.S.C. § 405(g), Nancy A. Berryhill is substituted for Carolyn W. Colvin.

Recommendation to the District Judge and recommends that Plaintiff's Motion for Summary Judgment be granted, Defendant's Motion for Summary Judgment be denied, the decision of the Commissioner be vacated, and the case remanded for further proceedings under sentence four of 42 U.S.C. § 405(g).

## II.   PROCEDURAL HISTORY

On October 15, 2012, Plaintiff protectively filed his  first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on February 29, 2017. (R. 213).  Plaintiff's earnings record shows that he acquired sufficient quarters of coverage to remain insured through September 30, 2016; therefore, Plaintiff must establish disability on or before this date. (R. 234).  This claim was initially denied on January 31, 2013 (R. 108-113) and denied again upon reconsideration on August 9, 2013 (R. 119-21, 122-24).  On August 27, 2013, Plaintiff filed a written request for a hearing (R. 125-26, 127-29), which was held before United States Administrative Law Judge ("ALJ") Brian P. Kilbane on November 20, 2014 in Charlottesville, Virginia. (R. 32-57). Plaintiff, represented by counsel Lindsay Bailey, Esq., appeared and testified, as did James Ganoe, an impartial vocational expert. Id. On January 30, 2015, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 7-30). On March 30, 2015, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 6).

## III.   BACKGROUND

### A.   Personal History

Plaintiff was born on June 26, 1973, and was 39 years old at the time he filed his first SSI

claim. (R. 213). He completed GED (R. 35). Plaintiff's prior work experience included truck driver (2002-2012) and correctional officer (2008-2010). (R. 239). He was married at the time he filed his  initial claim (R. 213) and was married  at the time of the administrative hearing. (R. 32-57). He has one dependent child. (R. 43). Plaintiff alleges disability based on degenerative disc disease of the cervical spine, thoracic spine, and lumbar spine; residuals from a right hernia repair, and hypertension. (R.12).

## B.    Medical History

### 1.  Medical History Pre-Dating Alleged Onset Date of February 29, 2012

On April 13, 2010, Plaintiff was seen by Timothy Bowers, M.D. for a second opinion consultation. (R. 308). Dr. Bowers first reviewed Plaintiff's relevant medical history:

> Mr. Davis is a very frustrated 36-year-old correctional officer who initially presented to his primary care physician in November 2009 with right groin pain. Mr. Davis recalls an episode at work in early November when he was required to forcibly wrestle an inmate to the ground. That following weekend he noted the onset of this groin pain, which was initially described as a constant, deep ache in the groin which radiated down to his right scrotum. He was seen by his primary care physician and subsequently referred to Urology, at which time he was told he had an "infection." He was given antibiotics to treat what sounds like epididymitis without improvement. He was seen initially by Dr. Pevzner and he was subsequently referred to the Urology Clinic at the University of Virginia where he says he was told that there was "nothing wrong." Following this he was evaluated by Dr. Bruhn and he then underwent laparoscopic repair of a right inguinal hernia. I have reviewed Dr. Bruhn's Operative Report and he describes the presence of a small direct and indirect hernia on the right. The hernia was repaired using a laparoscopic extraperitoneal approach without tacks or sutures.
> Following this hernia repair Mr. Davis has continued to have significant pain in the right groin and he has been unable to work due to the discomfort. He has been followed by Chronic Pain Services and he has undergone several interventions including nerve injections, placement of a TENS unit, and prescriptions for multiple different pain medications. Despite this, he continues to have significant discomfort and he presents here for a second opinion. He continues to describe his pain as a constant, deep-seeded ache in the groin which now is non-radiating. It is exacerbated by movement, stretching, straining, or lifting.

Id. Dr. Bowers then conducted a physical examination of Plaintiff, observing that his surgical incisions appear "well healed." Id. Plaintiff exhibited  "exquisite point tenderness just lateral to

the midline and superior to the pubic tubercle." Id. Dr. Bowen observed no obvious recurrence of hernia, no palpated masses, no testicular masses or tenderness, and no abnormalities of the penis or testes. Id. Dr. Bowers had "quite a long discussion with Mr. Davis" advising that he did not believe there was any way to determine whether his pain was related to the incident in November, or whether it was related to his hernia repair. Id.. Dr. Bowers noted that Dr. Bruhn was considering "open groin exploration with potential division of the ilioinguinal and genitofemoral nerves," but ultimately decided against the procedure. Id. Dr. Bowers agreed that nerve entrapment syndrome was highly unlikely and the procedure should not be done. Id.. However, he was not able to determine the source of Plaintiff's pain. Id. Dr. Bowers offered Plaintiff a referral to the UVA Surgical Clinic "for further evaluation; although, the reality of the situation is that they will unlikely be able to determine an etiology either." (R. 309).

On January 5, 2011, Plaintiff was seen at Winchester Medical Center complaining of groin and testicle pain, noted as acute/chronic right inquinal pain of indeterminate etiology. (R. 322). Plaintiff reported pain consistent to what he experienced prior to his first surgery (R. 324); symptoms included pain, fever, urinary symptoms, and swelling. (R. 322). Diagnostics completed that same day to rule out causes included an ultrasound of Plaintiff's kidney (R. 333) and scrotum (R. 334), both of which were normal. Plaintiff was given Motrin, advised to return immediately if symptoms worsened. Id. Plaintiff was also referred to Dr. Kleiner at the University of Virginia to be seen "ASAP." Id.

On June 20, 2011, an X-ray of Plaintiff's thoracic spine revealed "mild degenerative arthritis . . . with mild spondylosis," and a "question of abnormal sclerosis is seen [at] T10 and T11." (R. 473). Dr. Myung Kim, M.D. recommended that the "possibility of neoplastic process should be considered." Id.

On September 20, 2011, Plaintiff saw Dr. Chowdhary, M.D. at Hampshire Memorial Hospital for ongoing chronic right abdominal pain. (R. 572-73). Dr. Chowdhary reviewed Plaintiff's history and, after discussion, recommended surgical consultation.  (R. 573).

Plaintiff was referred to Advanced Pain Relief Centers ("APRC") pursuant to postoperative groin pain, for consideration of neuroma injection. (R. 417). At a visit on November 17, 2011, his pain was of moderate intensity, but progressively worsening; rated at 8 on a scale of 1 – 10. (R. 419). Episodes typically lasted the "majority of the day." Id.  The pain was aggravated by "movement in general and driving in his truck." Id. Previously, the pain had been relieved with neuroma injections "for the short term" and two surgeries, until a few weeks ago, when the pain returned. Id. Upon examination, Plaintiff was positive for abdominal pain and sleep disturbance, and negative for infection. Id. He appeared in moderate pain, with tenderness noted in the mid-lower surgical scar. Id. Review of other systems were normal. Id. Plaintiff was given a neuroma injection on his right side. (R. 418).

On December 23, 2011, Plaintiff was seen at the Emergency Room of Winchester Medical Center for injury to his left eye after it was hit by a piece of wood, causing blurred vision and pain/headache. (R. 364). Abrasion of his left eye was noted, along with drainage and a "small focus of gas in the [left] cornea." Id.

On January 23, 2012, Plaintiff checked into the Emergency Room of Winchester Medical Center experiencing pain in his right leg and right groin. (R. 344). He reported that the pain had recently moved into his back as well now for several weeks, Id., and steroid shots he had received at the pain clinic "ha[ve]n't helped at all." (R. 348). He also had swelling in the right thigh and discoloration in his right foot. (R. 349). Around 9:00 p.m., Plaintiff's pain was a 7 on a 1 – 10 scale. (R. 348). An ultrasound of Plaintiff's right groin to his right calf revealed no venous

abnormalities or evidence of hernia or lesions. (R. 355). Plaintiff was given Hydrocodone-Acetominophen and Naproxen for pain; after a few hours, his pain had reduced somewhat to a 5. (R. 350-54).

The next day, January 24, 2012, Plaintiff followed up with APRC for additional treatment. (R. 422). At this visit, the pain continued at moderate intensity, with episodes continuing to last the majority of the day. Id. Plaintiff reported that pain was now aggravated by "exertion, movement in general, and walking." Id. Plaintiff reported at that point that nothing was helping his pain; his last injection about a month earlier had provided "no relief." Id. Associated symptoms included "abdominal pain, parasthesias, back pain and blueish striations down [the] medial side of [his right] leg." Id. Plaintiff was negative for indicators of infection or fracture. Id. Notes indicate that Plaintiff was negative for anxiety, depression, and sleep disturbances, but the pain had a detrimental impact on excitability, mood, and socialization. Id. He reported pain at 7 on a scale of 1-10, that "functionally impact[ed] transition and mobility (partially immobilized by pain)." Id. Upon examination, Plaintiff was well developed, nourished, and groomed, but appeared "anxious [and] seems to be in moderate pain." Id. Remainder of systems were normal. Id. He again received another injection on his right side, in the ilioinguinal peripheral nerve. (R. 423). Plaintiff was prescribed a Lidocaine patch following the procedure. Id. As to Plaintiff's treatment plan, Alok Gopal, M.D. noted his current dilemma regarding treatment options:

> There does not seem to be a lot of options in terms of treatment -- the injections provide very good temporary relief and it comes back after the local wears off -- the question now is that should we:
> -- do a DCS stimulation in the spine to get the coverage of the groin
> -- or to a peripheral nerve stimulation in the region of the pain -- the question is who is do the final implantation if I do the peripheral stimulation --also the chance of it moving around is so high that not sure it is worth it

-- the last options may be to start with the stimulation in the spine -- if no coverage then plan on doing the peripheral stimulation --not sure how the insurance coverage will be for peripheral stimulation
We will plan on doing a repeat injection today. I gave him a DVD to watch about the DCS. We will bring him back for a follow up to see what his decision is.

Id.

Plaintiff saw his primary care physician, Karen Kimmel PA-C, in the interim on February 3, 2012. (R. 541). Plaintiff requested, among other things, sleeping pills to help him sleep at night. Id. PA-C Kimmel noted that Plaintiff "can't get a good night [sic] sleep due to pain and thought that a sleeping pill would help." Id. PA-C Kimmel also noted that Plaintiff qualified as overweight at that visit with a body mass index (BMI) of 28.83kg/m2. Id.

Plaintiff returned to APRC on February 9, 2012. (R. 425). Dr. Gopal noted that Plaintiff's pain was now "of severe intensity," and "nearly hourly" in frequency with variable duration. (R. 425). Plaintiff reported only "minimal relief" with ilioinguinal injections, Naprosyn, and Lidoderm. Id. At this visit, pain was rated at 6 on a scale of 1-10. Id. Plaintiff was now talking samples of Lyrica and Lorcet for pain in addition to his existing medications (Lidoderm, Aleve, and Ibuprofen). Id. At his visit, Plaintiff's treatment plan was amended to include referral to "a psychologist for . . . approval for the DCS trial." (R. 426).

On February 14, 2012, a CT scan of Plaintiff's abdomen and pelvis revealed that a soft tissue pericecal lesion was likely scar tissue from a prior appendectomy, and that diagnostic impressions also included "focal fatty sparing" on Plaintiff's liver. (R. 476). All other results were unremarkable. (R. 478).

On February 24, 2012, pursuant to that referral, Plaintiff saw Licensed Clinical Psychologist Glenn Paule-Carres, Ph.D., P.C., for assessment "to determine the psychological viability of [Plaintiff] pursuing a Spinal Cord Stimulator (SCS) procedure." (R. 313). Plaintiff

7

indicated problems with sleep, energy, "bad luck," sexual problems, and stress. Id. He further

explained:

> I have had 3 hernia surgeries since 2009. I have been to numerous dr. and they all say I
> have nerve damage from removal of the mesh. Dr. Kleiner from Charlottesville, VA sent
> me to Advance Pain Clinic and I have tried shots, tens device, pain pills and patches, and
> other pills. So far, nothing has worked so now they want to try neurostimulation.

(R. 311).

Following that consult, Dr. Paule-Carres wrote to Advanced Pain Relief Center and

advised he had found Plaintiff to be "an appropriate candidate, psychologically, for the SCS

procedure," and "endorse[d Advanced's] efforts to provide the treatment." (R. 313). Dr. Paule-

Carres based this opinion on the following:

> He was in observable physical discomfort and identified his current pain as "8" on a scale
> of 1-10. He "needed a pain pill but could not medicate if driving." His responses were
> indicative of a person being truthful and knowledgeable of his condition.
> Mr. Davis reported three hernia surgeries since 2009 and concurrent nerve damage that
> according to his GP and specialists does not indicate further surgery. Pain medication
> provides limited relief and increasing dosage leads to negative side effects. Injections
> have limited effect and other medications (Lyrica, Neurontin) are not effective. His
> activity is limited due to his chronic pain and he suspects he must discontinue his job as a
> truck driver.
> Denzil has researched and consulted regarding the SCS procedure and has appropriate
> expectations. His wife is supportive of the procedure. Denzil does not abuse alcohol or
> drugs and has been medically compliant. He hopes to be able to reduce medications,
> increase activity to a semblance of normalcy, and probably re-educate/re-train for a new
> career. He has no psychiatric condition that counter-indicates the SCS. He is able and
> prepared to manage the treatment.

(R. 313).

### 2. Medical History Post-Dating Alleged Onset Date of February 29, 2012

On March 12, 2012, Plaintiff (apparently) had his gallbladder removed, as noted in a

subsequent history. (R. 430). On March 20, 2012, Plaintiff saw Dr. Phillip Razzook, M.D.

pursuant to symptoms lasting the past three or four months, including "persistent and consistent

right upper quadrant pain, nausea, bloating, and occasionally vomiting after meals, particularly

fatty meals." (R. 316). Plaintiff had a "displaced laparoscopic hernia repair on the right groin

with permanent neuropathy." Id. Dr. Razzook noted that Plaintiff underwent surgery in

Charlottesville (University of Virginia) "to remove the rolled up mesh in the right lower quadrant

and subsequently underwent a standard open right inguinal repair." Id. An abdominal ultrasound

was negative for gallbladder stones, but showed fatty liver. Id. Dr. Razzook also observed a

"hypoechogenic area near the gallbladder fossa," which he suspected was more likely a result of

the fatty sparing rather than infection. Id. A Kinevac HIDA scan on February 27, 2012 revealed

"patent common bile duct and cystic duct abnormally low gallbladder ejection fraction at 32 . . .

consistent with gallbladder dysfunction." Id. When attempted treatment through diet,

antispasmodic pain medication, antibiotic, and a proton pump inhibitor were unsuccessful,

Plaintiff was scheduled for surgery. Id. Dr. Razzook noted that Plaintiff had already had to stop

working at that point, and could not work when the procedure was done. Id. Realizing that he

might soon lose his job as a result, Plaintiff wanted to get the procedure done. Id.

Subsequently, on March 23, 2012, Plaintiff was admitted to Potomac Valley Hospital in

Keyser, West Virginia for a laparoscopic cholecystectomy. (R. 314). Upon surgical entry, Dr.

Razzook noted chronic acalculous cholecystitis and "extensive small bowel and omental

adhesions totally plastering the gallbladder indicating multiple previous gallbladder attacks." Id.

On May 1, 2012, Plaintiff reported to PA-C Kimmel with a "knot in [his] surgical

incision" from hernia repair a year ago (R. 536) that was "red" and "ruptured." (R. 532).

On May 11, 2012, an MRI of Plaintiff's lumbar spine was normal. (R. 435). An

ultrasound of Plaintiff's right groin demonstrated no *significant* abnormality, though Jong Kim,

M.D. noted "a nonspecific 2 x 0.2 cm hypoechoic area likely representing a focal area of edema

or fluid collection." (R. 434). His primary care provider, Karen Kimmel, PA-C, referred Plaintiff to Dr. Jorge Posadas for follow-up, by whom Plaintiff was seen on May 16, 2012. (R. 320). Upon physical examination, Dr. Posadas noted Plaintiff was "obviously very tender to palpation anywhere in the right lower quadrant, right scrotum, right thigh etc.," but did "not feel any fluid collections" and observed "no signs of infection." Id. Upon return, Plaintiff advised PA-C Kimmel that Dr. Posadas told him there was "no infection and nothing needs to be done." (R. 532). However, since then, the area was "increasingly painful and drained a significant amount of bloody fluid." Id. Plaintiff reported that he had finished his antibiotics three days prior. Id.

Plaintiff followed up with PA-C Kimmel again on May 29, 2012 and reported that the additional antibiotics had improved his symptoms. (R. 529). Accordingly, she prescribed an additional 10 day course of antibiotics in hopes of resolving the wound infection. Id.  Although his spinal cord lead trial had already been postponed until May 22, they planned to postpone again until the infection was completely clear. (R. 533-34).

On June 19, 2012, Plaintiff was seen at APRC for "DCS" [spinal cord stimulator] trial. (R. 427). Pain was of moderate intensity at this visit; additional aggravating factors included "bouncing in a truck or on a riding lawn mower." Id. Symptoms were relieved with "Ultram in the past and previous lorcet medication." Id.  Upon inspection and palpation, Dr. Gopal observed "tenderness [] in the [right] inguinal region – hypeaesthesia and very painful." Id. Dr. Gopal observed that the spinal cord stimulator was medically necessary at that point:

> This procedure is medically necessary because of the following clinical reasons: The patient has undergone careful screening, evaluation, and diagnosis by a multidisciplinary team prior to implantation, Average pain levels greater than 5 on a scale of 0 to 10, Intermittent or continuous pain causing functional disability, Failure to respond to more conservative management treatments. No contraindications in regards to understanding of consent, nature of the procedure, needle placement or sedation, and Chronic pain resulting from the diagnoses mentioned in the HPI.

Id. Dr. Gopal proceeded to implant the leads for a spinal cord stimulator at "the middle aspect of T10 slightly right of midline." Id.

On June 22, 2012, Plaintiff returned to APRC describing a "stabbing" pain in the right lower quadrant and for followup post-lead-implant. (R. 430). Plaintiff was doing well with the leads at that visit, reporting an estimated "80% continuous relief." Id. Plaintiff was referred to Dr. Moshirfar for the "permanent stim[ulator]." Plaintiff's history noted, among other things, that "he works full-time." Id.

On July 17, 2012, Plaintiff was seen as a new patient by Ali Moshirfar, M.D at the Orthopaedic & Spine Surgery Institute. (R. 585). He also ordered MRIs of Plaintiff's spine, pelvis, and right hip, which were all subsequently completed on July 23, 2012. Id. Dr. Moshirfar assessed 1) slight thoracic spondylosis and degeneration, 2) mild thoracic T6-T7 and T7-T8 disc herniations without major central stenosis, 3) right inguinal nerve neuralgia, and 4) very slight lumbar spondylosis.[2] (R. 591). Dr. Moshirfar referred Plaintiff to John Ghramm, M.D. with Bone & Joint Specialists of Winchester to evaluate Plaintiff's hip for "signs of femoroacetabular impingement or labral tears," neither of which were present. (R. 595). Dr. Ghramm concurred that a spinal cord stimulator "should give [Plaintiff] the best relief of pain." (R. 596).

_____

[2] The MRI of Plaintiff's thoracic spine revealed "central disc protrusion at the C5-C6 level," "focal central rightward disc protrusion/herniation at the T6-C7 level," and "a tiny central disc protrusion/herniation at the T7-T8 level." (R. 337). The diagnostic impression was "mild spinal stenosis without cord compression." Id. Also observed was "minimal disc bulge" at L3-L4, "mild disc bulge causing mild left foraminal narrowing" at L4-L5, "mild facet hypertrophy" at L5-S1, "mild degenerative changes and . . . straightening of the lumbar lordosis." (R. 339). Erik Nelson, M.D. additionally noted "small endplate osteophytes" and cholecystectomy clips were visible, one in the Morison's pouch region and one over Plaintiff's left pelvis. (R. 340-341). His diagnostic impression was "multilevel degenerative disc disease without acute fracture or subluxation." Id. The MRI of Plaintiff's lumbar spine additionally revealed "mild levoscoliosis with apex at L3-L4," and a "small Schorl's node invaginating the inferior endplate of L1;" results were otherwise unremarkable. (R. 341).
The MRI of Plaintiff's pelvis revealed no fractures or dislocation and normal hip alignment. (R. 342). Dr. Nelson noted "abnormal convexity at each femoral head-neck junction, right greater than left," and "minimal superior offset of the right pubic bone." Id. The MRI of Plaintiff's right hip additionally revealed "decreased femoral head-neck offset, with mild convexity at the junction and local fibrocystic change." Id. Dr. Nelson noted that the convexity findings are "seen in patients with underlying cam-type femoral-acetabular impingement." Id.

Subsequently, on September 7, 2012, pursuant to Plaintiff's history of "multiple right inguinal hernia surgeries with subsequent inguinal neuralgia, neuritis and chronic pain, and regional pain syndrome," and conservative treatments having "failed," Plaintiff underwent surgery to implant a spinal cord stimulator and generator at Inova Loudon Hospital. (R. 365). Attending physician Ali Moshirfar, M.D. first completed a T11-T12 laminectomy, then "insert[ed the] spinal cord stimulator paddle lead[,] creat[ed ]a generator pocket over the right buttock, and programm[ed] the lead." Id. No complications were noted other than Plaintiff experiencing "moderate incisional pain" post-operation. Id. Plaintiff was prescribed Vicodin for pain, Senokot, and Valium. Id. Dr. Moshirfar planned to discharge Plaintiff on September 8, 2017, but discharge was delayed when Plaintiff began having "increasing thoracic pain and paraspinal pain and spasms." (R. 366). He was prescribed OxyContin in addition to Vicodin to treat this and continued incisional pain. Id.

At postop followup on September 25, 2012, Plaintiff  was placed on antibiotics with Keflex for a "prophylactic course." (R. 629) as well as Levaquin (R. 631). Plaintiff's post-operative complications continued, with complaints of swelling in his legs and feet, and his diastolic blood pressure having been in the 90s since his surgery. (R. 520). On October 15, 2012, Plaintiff followed up with PA-C Kimmel with "several complaints and concerns." (R. 517). She noted, in addition to continued problems with high blood pressure and heartburn:

> He had surgery about a month ago to have a nerve stimulator implanted in his back, after the surgery there was concern about infection at the incision site and he was treated with Keflex by his surgeon . He has been done with the antibiotics for a couple of weeks and his wife has now noticed yellow to green discharge on the bandage when changing the dressings. The patient also complains of some increased pain at the site over the past 1-2 days. He denies any fever, denies any headache or dizziness. He does not have any follow up with his surgeon who is located over 2 hours away.

12

Id. The wound at Plaintiff's surgical incision on his back was cultured and sent to the lab for testing; Plaintiff was started on antibiotics. Id.  At his next visit with Dr. Moshirfar on October 17, 2012, Plaintiff reported some pain, worse with movement, better with medication and rest. (R. 633). Plaintiff was placed on Cipro and Bactrim ointment, Id., and given a refill on Percocet for pain. (R. 634). On, November 7, 2012, pursuant to continued "slow healing of the thoracic incision" (R. 627), and though "no evidence of any infection" was noted, Plaintiff was instructed to use Silvadene cream and continue with dressing changes. Id. On December 5, 2012, PA-C Kimmel recommended Plaintiff be scheduled with Dr. Posadas for upper endoscopy and H. pylori testing, "due to the persistent nature of his symptoms." (R. 513). Tests were negative for H. pylori, but some degree of distal esophagitis was observed pursuant to an upper endoscopy. (R. 762).

Plaintiff briefly saw Meera Appaswamy, M.D., with Western Maryland Regional Medical Center in Cumberland for pain management, though he advised PA-C Kimmel she referred him to the previous doctor in Virginia he had already seen, and his new insurance (West Virginia Medicaid) wasn't accepted there. (R. 653, 693). On March 14, 2013, Plaintiff reported being depressed since his health problems continued, on top of losing his job and his health insurance. (R. 685). He reported feeling down and unmotivated, having "crying spells" and "little energy to do things," and suicidal thinking. (R. 685). PA-C Kimmel diagnosed Major Depressive Disorder and prescribed Cymbalta. (R. 686). On April 10, 2013, Plaintiff's wife (who accompanied him to a follow up visit) reported that she had noticed improvement in Plaintiff after taking Cymbalta. (R. 682). On April 17, 2013 Plaintiff reported to PA-C Kimmel with sore throat, and white patches in his mouth and throat, recalling frequent episodes of throat and wound infection over the past six to nine months. (R. 679). PA-C Kimmel noted that Plaintiff

13

had been referred to an infectious disease specialist before any further surgeries were undertaken, given his difficulty. Id. At a subsequent visit, he was re-referred to a specialist at West Virginia University (WVU) hospitals to ensure compatibility with his new non-private insurance (West Virginia Medicaid). (R. 693). The referral was pursuant to "recurrent infections over [the] past year with mildly elevated [white blood cell] count." (R. 695). Though Dr. Moshirfar did not accept Plaintiff's new insurance, he wrote letters to Plaintiff and documentation notes acknowledging the need for an infectious disease consultation, and raising the possibility that the generator implanted into Plaintiff "may have to be removed if it is . . . the source of the infection." (R. 697-98).

On May 8, 2013, Plaintiff reported back to PA-C Kimmel with his Division of Transportation physical examination paperwork. (R. 747). Although Plaintiff was "not currently employed and [] not doing any type of commercial driving," he wanted to keep his license from expiring if possible "in hopes that he will be able to work again in the future." Id. PA-C Kimmel noted that Plaintiff was "not looking for pain medication, [but] simply want[s] something done to relieve his symptoms and hopefully eventually get back to work." Id. He was seeking referral to a surgeon and was scheduled to see an infectious disease specialist. Id.

On May 16, 2013, Plaintiff was examined by Rashida Khakoo, M.D. with WVU Hospitals pursuant to the infectious disease referral. (R. 780). Dr. Khakoo advised PA-C Kimmel that she "agreed with [Kimmel] that [Plaintiff] has spinal cord stimulator-related infection," and "could have some persistent problems also at the right inguinal hernia repair site." Id. Dr. Khakoo could not have an MRI of the lumbar spine done with Plaintiff's spinal cord stimulator, but felt it was "very important for [Plaintiff] to be seen by [Neurosurgery]" and scheduled an appointment early the next week. Id. On May 21, 2013, Plaintiff saw Charles Rosen, M.D. in

14

neurosurgery. (R. 789). Dr. Rosen felt that although Plaintiff did not have an "urgent infectious issue" at that point, "his wife to have the [spinal cord stimulator] removed because of his previous problems is valid." Id.

Plaintiff returned to Dr. Posadas on May 28, 2013 where it was noted that he had been seen at WVU and they suspected a recurrence of the right inguinal hernia. (R. 742). However, Dr. Posadas advised patient "This is not the best time to do any elective surgery," as he is "battling with this infected nerve simulator and we would . . . like to have this nerve simulator either removed or cleared by the Infectious Disease Specialist." (R. 743). At follow-up on May 30, 2013, Dr. Khakoo noted that Plaintiff had been referred to Dr. Cohen for surgical removal of the stimulator on June 20, but that she was "concerned about this stimulator and it has to be removed," and would ask that it be done sooner. (R. 792). On July 30, 2013, Dr. Cohen surgically removed the spinal cord stimulator. (R. 802-08).

In October 2013, Plaintiff complained additionally of blood in his stool, for which he was referred for a colonoscopy (R. 907), and penile discharge upon bowel movements, as well as urinary tract symptoms. (R. 903). He was also experiencing chest pains unrelated to exertion, and having difficulty sleeping. Id.

On November 2, 2013, Plaintiff went to the Emergency Room of Winchester Medical Center Hospital for an abscess:

> This is a 40-year-old male. He complains of his primary acute problem as having an abscess on his lower abdomen. He points to the right lower quadrant area. The patient states he has a remote hernia repair in this region and he has had every now and then an abscess comes up on the incision. He has had a swollen tender area there for the last 2 to 3 days. He has never been seen for this in the past. He has never had to have it drained. He states he is actually in the past taken a safety pin and punctured the area to let it drain. The patient states this as above. It has been going on for 2 to 3 days. He denies any intra-abdominal pain. He denies any fever or chills . . .[but had developed a cough]. . . The patient also states that he has been evaluated by Infectious Disease doctor in Morgantown for an elevated white count. He is being evaluated for approximately 2 to 3 months.

> Initially, he was felt that he had an infection in his nerve stimulator, which was removed. He has had a persistently elevated white count. He states his last white 2 weeks ago was 13,000. He is concerned that they are not doing anything or treating him for anything at this point in time.

(R. 889). Dr. Hendren incised and drained the abscesss and sent the wound culture for

evaluation. (R. 884).

A chest X-ray on December 5, 2013 revealed a mass or potentially an enlarging left

epicardial fat pad. (R. 830). On December 10, 2013, Plaintiff was seen at Mountaineer

Community Health Center for review of a CT scan, reporting current abdominal paint, right mid

back pain, and right lumbar pack pain. (R. 811). He also reported that his night sweats are

"getting worse" and he now has a rash under both arms that he believes was related. Id.

On March 27, 2014, SPECT imaging of Plaintiff's chest, ribs, thoracic lumbar spine and

upper pelvis showed no evidence of abnormality apart from "incidental right rib fractures [at the]

fourth and sixth ribs." (R. 832). Plaintiff subsequently began physical therapy treatment with

Valley Health Rehabilitation Services on April 2, 2014 for "displacement of cervical

intervertebral disc without myelopathy," and "cervicalgia." (R. 836). Upon intake, Plaintiff

reported "difficulty with daily activities, joint stiffness, numbness, pain and tingling," "insidious

onset cervical pain [and] intermittent [right] UE numbness/pain for the past year or so," which

was "getting worse." Id. Clinical impressions included "increased central cervicalgia,"

"increase[d] right UE radicular [signs and symptoms] with cervical motions [and right] shoulder

motions." (R. 837). Plaintiff's treatment plan for physical therapy included traction, manual

therapy, aquatic therapy, neuromuscular therapy, applying heat/cold packs, as well as exertional

activities and stimulation. Id. Treating physical therapist Bryan Pittman, DPT, listed the

following impairments: "impaired flexibility, joint integrity, joint mobility, muscle strength,

pain, impaired postural alignment, poor body mechanics, posture and range of motion." (R. 840).

On April 4, 2014, Plaintiff reported pain rated at 6 on a scale of 1-10, and that he was having difficulty completing the prescribed activities at home. (R. 843). The "corner stretch" "really bothered [him]," and reported that the "entire dorsal/plantar surface hand goes numb." Id. Upon return visit on April 8, 2014, Plaintiff reported that the exercises he was doing "just aggravates it and makes it worse, but [he was] willing to try this and see if it helps." (R. 845). PT Pittman's summary noted that there was a "slight overall reduction in pain," although Plaintiff had "some very significant trigger points and pressure on several of them do produce radicular symptoms." Id. He planned to continue "tissue work" to try to reduce radicular symptoms. Id. On April 10, 2014, Plaintiff reported soreness and numbness, interspersed with occasional relief, then tightening back up. (R. 847). PT Pittman noted that Plaintif "continues to have substantial knots and trigger points" and would accordingly continue to "require deep disuse work as tolerated." Id. Over the course of the treatment, there was slight improvement in overall pain levels and mobility following treatment, though improvement continued to be "slow." (R. 849-51). On April 23, 2014, Plaintiff reported his pain levels and symptoms regressed to their starting level (6 out of 10) (R. 853). On April 25, 2014, Plaintiff "could hardly move Wednesday night after therapy," noting "it still hurt pretty bad [two] days later." (R. 856). He also experienced discomfort and trapezius muscle twitching near his incision during treatment that he had not previously experienced. Id. On April 28, 2014 Plaintiff reported trying to mow the lawn with the riding mower, but had to abandon the task after "about half of the yard" because it "hurt too bad." (R. 858). After nine visits to physical therapy, he was still experiencing increased pain (7 out of 10) and "several trigger points" through his trapezius muscle, causing "facial grimacing and verbal discomfort." (R. 861).

By April 30, 2014, PT Pittman's plan was amended to note that he would "attempt 0-4 more PT sessions, then discharge secondary to lack of progress towards PT goals [and] recommend return to doctor for further medical testing." (R. 863). By May 5, 2014, Plaintiff reported having to take a muscle relaxer from the soreness from his last physical therapy appointment. (R. 866). He had increased discomfort with "all manual treatments," and was "particularly sensitive to very light pressure in rib area." Id. In a progress summary, it was noted that Plaintiff had "poor progress [with physical therapy]," and a "-1 functional outcomes score." (R. 869). It was recommended that Plaintiff return to his medical doctor, for evaluation of "systemic infection secondary to chronic elevated [white blood cells and] pain distributions not consistent with cervical herniated nucleus pulposus." Id. By May 8, 2014, Plaintiff reported 7 out of 10 pain at rest, and 9 out of 10 maximum pain; as well as continued "unbearable" pain and tingling, relieved only by sitting down and resting. (R. 871).

On July 14, 2014, Dr. Emery noted that a thoracic MRI was unremarkable, and showed "no evidence of any diskitis or vertebral osteomyelitis."  (R. 944). A cervical MRI showed a "central disk herniation at C5-C6 with some cord deformation," and a "moderately large" "right-sided disk herniation" at C6-C7. Id.  Dr. Emery decided to give Plaintiff a root block at C7, noting that Plaintiff was "having a lot of trouble" and "wants to go back to work." Id. He also evidenced "slight weakness of his right hand grip compared to his left." (R. 947).

On August 22, 2014, Plaintiff was seen again by Chad Hott, PNP, with continued complaints of chronic joint pain and muscle tenderness. (R. 951). PNP Hott diagnosed Fibromyalgia, with plans to continue Cymbalta. (R. 954).

On September 3, 2014, Plaintiff returned to physical therapy after an MRI showed two herniations in his neck, and three herniations in his low back. (R. 1004). Plaintiff reported that

his doctor wanted to do surgery, but it would not be covered by insurance until he completed another six weeks of physical therapy. Id.

At a follow-up appointment on October 27, 2014, Dr. Emery noted that "it does not look like we are going to be able to get anything approved for an injection," though he felt Plaintiff was a good candidate for surgical intervention via two-level anterior cervical discectomy and fusion ("ACDF"). (R. 1022). A cervical spine MRI done that same day showed degeneratives changes including cervical lordosis, early degenerative disc disease with slight disc height loss at C$-C5 and C5-6, some apophyseal joint narrowing and sclaerosis at C5-C6, C6-C7, and C7-T1. (R. 1024).

### 3. Medical Reports/Opinions

#### a. *Disability Determination at the Initial Level*

On January 26, 2013, agency reviewer Narendra Parikshak, M.D. reviewed Plaintiff's records and completed a physical residual functional capacity ("RFC") assessment. (R. 62). Dr. Parikshak found the following medically determinable impairments: 1) discogenic and degenerative disorders of the back (primary, severe); 2) other diseases of the spinal cord (secondary, severe); and essential hypertension (other, nonsevere). (R. 71). Plaintiff to have a capacity for light work, based on exertional limitations. Id. She found that Plaintiff could occasionally lift and/or carry 20 pounds, and frequently lift and/or carry 10 pounds. (R. 63). Plaintiff could stand and/or walk, and sit, for about six hours in an eight-hour workday. Id. Plaintiff's ability to push and/or pull was unlimited, other than shown. Id. She based those conclusions on Plaintiff's need to move "every 30 min[utes] to 1 [hour] to relieve back discomfort." Id. She found Plaintiff to also have the following postural limitations: he could occasionally balance, stoop, kneel, crouch, and crawl, and occasionally climb ladders, ropes,

scaffolds, ramps, and stairs. Id. She found no manipulative, visual, or communicative limitations. Plaintiff had the following environmental limitations: avoid concentrated exposure to vibration and extreme heat or cold, and avoid even moderate exposure to hazards. (R. 64). Plaintiff was permitted unlimited exposure to wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation. Id. Though the RFC was light, she "suggest[ed] sedentary jobs [due to] the fact that the RFC calls for alternating sitting/standing every 30 min[utes due to] back pain." (R. 66).

### b. *Mental Status Examination*

On June 25, 2013, Tracy L. Cosner-Shepherd, M.A. conducted a mental status examination of Plaintiff pursuant to increased depression and anxiety. (R. 796). Plaintiff was cooperative, maintained good eye contact and gave appropriate responses; his mood was pleasant and his affect was broad. (R. 798). No problems with thoughts or perceptions were observed. Id. Plaintiff's insight was fair to average, and his judgment was mildly deficient. Id. Plaintiff denied any *recent* suidical thoughts, and denied any homicidal thoughts. Id. His concentration, immediate memory and remote memory were within normal limits, but recent memory was "markedly deficient." Id. Psychomotor behavior was also within normal limits. Id. Cosner-Shepherd diagnosed Depressive Disorder (not otherwise specified), and Pain Disorder associated with both psychological factors and a general medical condition. (R. 799). Her diagnostic rationale was as follows:

> A diagnosis of Depressive Disorder NOS was based on reported symptoms of depression, as he did state that he has had problems with both depression and anxiety for the last year or so. He denied problems with either in the past. He has had some issues with health and chronic pain. He has likely had some adjustment issues as well, but it appears he has had full-blown symptoms of a Depressive Disorder. One should rule out a Major Depressive Disorder, Single Episode. The anxiety, which he said usually happens when he is stressed out, often does accompany depression. The additional diagnosis of Pain Disorder was based on his primary complaint of physical pain which has affected his mood.

Id. Her prognosis of Plaintiff was fair. Id.

### c. *Disability Determination at the Reconsideration Level*

On August 8, 2013, agency reviewer G. David Allen, Ph.D. reviewed the updated file and found, in addition to all three prior physical impairments, Plaintiff also had somatoform disorders (other, non-severe) and affective disorders (other, non-severe). (R. 86). He found that these impairments resulted in mild limitations on Plaintiff's restriction of activities of daily living, difficulties in maintaining social functioning, and repeated episodes of decompensation. (R. 87). Plaintiff's impairments were reasonably expected to produce his pain or other symptoms, and the objective medical evidence substantiated Plaintiff's subjective complaints about the intensity, persistence, and limiting effects of the symptoms (i.e., finding him credible). (R. 62).

On August 8, 2013, agency reviewer Porfirio Pascasio, M.D reviewed the updated file and the prior RFC assessment and affirmed it as written. (R. 86). At the reconsideration level, Plaintiff's impairments were again reasonably expected to produce his pain or other symptoms, and the objective medical evidence again substantiated Plaintiff's subjective complaints about the intensity, persistence, and limiting effects of the symptoms (i.e., found him credible). (R. 87).

## C.   Testimonial Evidence

At the ALJ hearing held on November 20, 2014, Plaintiff testified that he had been married for twenty-three years, and lived with his wife and two-and-a-half year old daughter, and nineteen-year-old son. (R. 43-44). Plaintiff testified that he had worked as a truck driver for fifteen years, and most recently as a correctional officer for about a year and a half. (R. 43).

Plaintiff further testified that he does not know how his neck and upper back were "hurt" (in the ALJ's words); just that the pain started two and half years ago and kept getting worse. (R. 45). Dr. Emery had Plaintiff scheduled for surgery on January 16 [2015] to fix the herniations in

his neck, and would schedule the same for his back once that was taken care of. Id. Plaintiff

reported that sitting, driving, standing, and walking are all difficult for him. Id. When asked to

describe the pain in his neck and upper back, Plaintiff responded:

> A     . . . it just makes my whole right side of my head feel like it's going to explode
> and the pain shoots down my arm and I have numbness in my arm and in my
> fingers on the right side. And the back, it's like sitting or driving or anything like
> that, it just kills me.

(R. 46). Plaintiff testified that he can sit for about half an hour before needing to stand. Id. When

Plaintiff walks, his leg swells up and it's painful to walk any distance; timing steps is difficult.

Id. If Plaintiff is walking on flat ground, he can walk for "maybe 10 minutes;" but if "on heel,"

he "can't hardly do it." Id. He cannot stand in one place for a long period of time, and has to

"move back and forth" after about ten minutes. (R. 47). Plaintiff is was directed not to lift

anything over fifteen pounds by his doctor; doing so causes shooting pain, numbness and

weakness in his right arm. Id. This also impacts Plaintiff's ability to grasp, hold, or pick up

things. Id. Plaintiff takes medicine for his pain; it helps him relax "a little bit to where [he] can

rest, but they don't take the actual pain completely away." Id. His left arm is unaffected. Id.

> Plaintiff also testified regarding his daily activities:
> A     Really anymore, unless I go to the doctors or something, I really don't do
> anything. I used to try to help my wife vacuum and stuff like that but I can't do
> that because I'm right-handed and I always want to use my right arm and I
> can't stand the motion back and forth all the time.
> Q     When do you think was the last time you did anything like that?
> A     Probably I don't know. It's been a while. Probably six months at least.
> Q     Do you ever try to do yard work?
> A     I tried mowing the yard --
> Q     Do you have a riding mower?
> A     Well, I used to, but -- before we moved I used to try to mow the yard but I
> couldn't do it, back about two swipes and that was it. I had to get off.
> Q     What hurt about that? The sitting and the --
> A     The back and the neck.
> Q     -- vibrations or --
> A     The vibration.
> Q     Okay. So two rows of your yard, is that

A       It was two acres, so I'd make about two swipes --
Q       Couple minutes?
A       Yeah. About 10, 15 minutes and I'd have to get off.
Q       And how often did you try to do that?
A       I tried to do it once in a while but my wife always made me get off and she did it.
Q       Okay. You watch TV?
A       Yes.
Q       Do you read books?·
A       No.
Q       Newspaper?
A       Once in a while.
Q       Do you have any social activities that you go to as far as clubs or organizations?
A       No.
Q       Any friends?
A       Not really.
Q       Does anyone ever come over and visit you?
A       Not really.
Q       Okay.
A       I used to love hunting and stuff, but I can't do that. I haven't been able to do that for the last three years.

(R. 48-50).

## D.    Vocational Evidence

Also testifying at the hearing was James Ganoe  a vocational expert.   Mr. Ganoe characterized Plaintiff's past work as a truck driver as medium and semi-skilled work with a specific vocational preparation ("SVP") of 4. With regards to Plaintiff's ability to return to his prior work, Mr. Ganoe gave the following responses to the ALJ's hypothetical:

Q:      Please assume we have a hypothetical person same age, education, and work history as Mr. Davis, but that person can only occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and walk with normal breaks for a total of about six hours in an eight-hour workday and sit with normal breaks for about six hours in an eight-hour workday. And person could occasionally climb ramps and stairs as well as ladders, ropes, and scaffolds, could also occasionally balance, stoop, kneel, crouch, and crawl. The person should avoid concentrated exposure to extreme cold, extreme heat, avoid concentrated exposure to vibration and also avoid even moderate exposure to hazards. With those limitations, are there any jobs he's done in the past he can still do?
A:      No, he would not be able to, your honor.

(R. 52).

23

Incorporating the above hypothetical, the ALJ then questioned Mr. Ganoe regarding whether there was any work Plaintiff could perform:

Q:      Are there any jobs such a person could do?
A:      The region I'll be using, your honor, is West Virginia. Under the light exertional level, a ticket seller. The DOT is code is 211.467-010, the SVP is 2, it's an unskilled position. 1.7 million nationally, 3,800 regionally. Also under the light exertional level, a mail clerk working in private business. The DOT code is 209.687-026. The SVP is 2, it's an unskilled position. 202,000 nationally, 650 regionally. Also under the light exertional level, an information clerk. The DOT code is 237.367-018. The SVP is 2, it's an unskilled position. 210,000 nationally, 700 regionally. Those are samplings, your honor.
Q:      These are all light and unskilled?
A:      Yes, your honor.

(R. 52).  Plaintiff's attorney then questioned Mr. Ganoe:

Q       If you take the judge's first hypothetical and then you add that the individual would need a sit/stand option at will and they would be limited in reaching in all directions with their right dominant arm and also limited to occasional handling and fingering with that right hand, what impact does that have on the jobs that you listed, if any?
A       Well, I think if the individual needed a sit/stand option at will, I don't think the jobs would be available. That's based on my experience.
Q       No jobs at the light level or at all?
A       None at the light level.
Q       If you leave out the sit/stand option at will, could the individual perform the light jobs with the limitations in the upper extremity?
A       Could you restate those for me, please?
Q       Sure. Limited to occasionally in reaching in all directions with the right upper extremity, which is his dominant -- which is the individual's dominant arm, as well as occasional handling and fingering with that dominant hand.
A       No, the jobs would not be available.
Q       Is *it* the same for a -- if the individual was limited to sedentary work, had the sit/stand option at will and limitations in the upper extremity, would that preclude jobs?
A       I think with the sit/stand *it* would not preclude jobs. I think jobs would still be available. With the reaching and the -- in all directions and the handling and fingering, I would have jobs available but I would not have them in significant numbers.
Q       And what -- *is it* mostly the handling and fingering that counts out the job? If you got rid of the limitation in handling and fingering and just had the limitation with the reaching, does that -- are the results the same?

A:     Well, the reaching -- I would be able to find jobs, but the handling and fingering, it's limited, but there are jobs available with the handling and fingering, just not in significant numbers.

Q:     Okay. Could you tell me the jobs at the sedentary level with the sit/stand option where there's only occasional reaching in all directions with the right upper extremity, the dominant arm?

A     Well, I have a surveillance monitor. The DOT code is 379.367-010. It's an unskilled position, it's SVP 2. I have a call out operator. The DOT code is 237.367-014. The SVP is 2, it's an unskilled position.

Q     Are those the only two jobs?

A     That's the only two that I have available, yes.

Q     And if an individual were off task due to pain for 20 percent of the workday consistently, could that individual maintain employment?

A     Based upon my experience, most employers will allow an individual to be off-task 10 percent of the time. Anything more than that and the individual would lose their employment.

Q     And if an individual had to miss two days or more consistently, would that person be able to maintain employment?

A     Based upon my experience, no they would not be able to.

Q     Are there any limitations in elevating one's legs in a sedentary position?

A     Meaning?

Q     If a person had to elevate their legs at the hip level on a regular basis, would they be free to do that at the sedentary level?

A     No, not generally. Most of the time the individual would be able to do that at breaks or their lunch period, but other than that, no.

Q     Okay.

**Examination by of VE by ALJ:**

Q     Okay, Mr. [Ganoe], could you tell me the number of jobs that exist for surveillance monitor and call out operator?

A     97,000 nationally for the surveillance monitor, 200 regionally. 97,000 nationally. And the call out operator is 79,000 nationally and 180 regionally.

Q     And the region is West Virginia, is that correct?

A     Yes it is, your honor.

(R. 53-56).

## E.   Report of Contact Forms or Disability Reports

A Disability Report Form - Appeal, dated August 27, 2013, noted the following changes, occurring on or about August 10, 2013:

[O]n July 30, 201 the neuro stimulater [sic] was taken out of my back and buttocks after the use of the hydrocodone for surgery pain the chronic pain in my groin, testicle, and

> thigh on right side gradually coming back pain in lower abdomen, uncontrollable leakage of semin [sic] when pooping and peeing followed by worsing [sic] pain

(R. 285). He further reported that he was having difficulty with hygiene and personal care, and that "sexual contact with [his] wife is nonexistent due to pain and problems with erections," he has constant pain in his abdomen and groin down into his testicle. (R. 288). His ongoing pain prevents him from doing "much of anything." Id.

## F.    Lifestyle Evidence

On an adult function report dated March 14, 2013, which his wife Angela helped him complete, Plaintiff stated that a neuro stimulator had been implanted in his spine in an attempt to treat nerve pain, which significantly limits his abilities. (R. 252). He "can not lift anything 10 lbs or more, cannot bend or twist" for risk of damaging the leads in his spine. Id. Before Plaintiff started experiencing these problems, he was able to "engage in physical activities [without] pain, such as work (truck driver), have sex with [his] wife, lift heavy items such as [taking] out trash bags[, and] help with chores like mowing the grass and vaccuming. (R. 253). Plaintiff has had difficulty sleeping; before the neurostimulator was implanted, pain from nerve damage would wake him; after the implant, he can no longer sleep on his back because the neurostimulator would cause a "shocking sensation." Id. Plaintiff elaborated:

> Still trying to be seen by Advanced Pain Relief in Winchester, Va. Dr. Appaswany called spoke with them about denying me to be seen. Waiting for a response. The pain has been so bad I cannot sleep, the pain is so overwhelming it brings me to the point of just wanting to give up & cry, which I do not often do. I just want to receive medical help to void the pain the though of taking out the device & just going back to the pain I had before has crossed my mind. [The Medtronic representative] said it may have moved (the battery pack) it has been known to happen.

(R. 260-261).

As to his daily activities, Plaintiff reported that most days, when he does not have to attend doctor's appointments, he watches television and sometimes helps his wife fold clothes,

wash baby bottles, and take care of their infant daughter. (R. 253). However, his ability to do so is limited because he cannot hold his daughter for too long, as it hurts his back. Id. He puts out food for their two cats, but his wife and son have to clean the litter box and lift bags of cat food, since he cannot. Id. Plaintiff is limited in his personal care because he has to bend very carefully to put on pants and socks, and cannot take baths due to "open wound" in his spine. Id. Plaintiff can shower, but only if he does not put his back to the water. Id. Plaintiff can prepare basic foods for himself such as frozen pizza or sandwiches, but "since stimulator surgery, [he] can't lift heavy boiling pots of water to drain such as potatoes." (R. 254).

As to house and yard work, Plaintiff can do some dishes and fold and hang laundry, but cannot carry baskets of laundry, nor can he take clothes out of the washer or dryer. Id. He can do these things for "about [fifteen to twenty] minutes, [a] couple [of] times a week." Id. Plaintiff provided these additional remarks as to household duties:

> [Cannot sit] for periods of time as minimal as 15 to 20 min, riding in vehicle to Dr. appts is the only time I go out. The pain in my buttocks has been there since my operation on Sept. 7th 2012. It has not gotten any better & has become to the point of unbearable pain in Jan of 2013.

(R. 260).

Plaintiff accompanies his wife grocery shopping "about once a month" for approximately half an hour, but his wife and son have to lift the groceries. (R. 255). Apart from leaving the house "3 or 4 times a month" for this or doctor's appointments, Plaintiff typically only goes out on his porch once a day in order to feed the cat. (R. 255). When he does go out, Plaintiff either drives himself or rides in the car. Id. He cannot take their daughter by himself, due to being unable to lift her and her car seat together. (R. 256). He is able to pay bills, handle a savings account, and use a checkbook. (R. 255).

As to hobbies and interests, Plaintiff watches television every day. (R. 256). He used to enjoy hunting, though he has "not hunted for years due to surgeries." Id. He can no longer do the necessary things, like "shoot a gun, or walk a lot, or drag a deer." Id. Plaintiff's social activities are limited. Id. He reports spending time with his wife and children, watching television, and talking every day. Id. He does not go anywhere regularly other than doctor's appointments, and noted going only to his sister's for Thanksgiving. Id. He reports no problems getting along with family, friends, others, (R. 257), authority figures, or coworkers (R. 258). Since his medical problems began, Plaintiff can no longer physically participate in social activities, nor does he have the money to do so. (R. 257).

Plaintiff reported not handling stress well at times, and notes that he has "high blood pressure caused by stress [and] pain." (R. 258). He reported no problems with changes in routine. Id. Plaintiff reported a fear of pulling the leads out of his back and paralyzing himself, and being "short tempered at times due to overload of stress." Id. He also described stressors from:

> [T]he pain nonstop and inability to be able to work, the financial stresses from no income for the family. The depression is to the point I cannot overcome it on my own, I have had to seek medical assistance to help me. The inability to perform sexually for my wife the act of sex is very painful for me which causes stress mentally & physically.

(R. 260).

In terms of physical aids, Plaintiff was prescribed a "neuro stimulator in spine [and a] battery pack in [his] butt," which were surgically implanted in his spine and buttocks in September 7, 2012. Id. Plaintiff was taking Tramadol (Ultram), which caused tiredness. (R. 259).

Plaintiff reports that his ability to lift, squat, bend, stand, reach, walk, sit kneel, and climb stairs is affected:

> Lifting – anything over 10 lbs, squatting – lifting self back up hurts butt due to device in butt using butt muscle, bending – same, standing – for more than [an hour] at a time,

28

> reaching – pulling on back, walking – hurts back [and] butt after a while, sitting – same, kneeling – same, stair climbing – same causes pain to back [and] butt.

(R. 257). Plaintiff reports being able to walk about half a mile before having to stop and rest for about an hour before continuing on. Id. He reports no problems paying attention or following instructions. Id. In the Remarks section, Plaintiff added the following:

> I still to date have pain in my back [and] butt. I still to date have an open wound in my back. I have not been released by Dr. Moshifar as of yet. I listen to him [and] limit my activity for fear of injuring myself [and] possibly causing damage or paralyzing myself. I can't even hold [and] take care of my daughter to the [extent] I want to because of the pain in my back that comes from holding her. She to date weighs approx[imately] 9 lbs. I won't be able to care for her for much longer. This upsets [and] stressed me as well as the financial stress I have.

(R. 259).

On a second adult function report dated approximately one month later, April 28, 2013, which his wife Angela helped him complete, Plaintiff reported some additional deteriorations. (R. 270). In addition to problems bathing and showering noted before, Plaintiff reported he was having problems sitting on the toilet as it was painful, and he could not sit at the dinner table for long periods of time. (R. 271). He reports not being able to finish the household chores he attempts, and his wife and son take over "most of the time." (R. 272). Plaintiff reports that he began "try[ing] to walk for exercise" a few times a week because he has been gaining weight. (R. 273). Plaintiff added problems with "depression, fear [he'll] never be without pain, stress with not being able to provide for & take care of my family." (R. 276). He also reported taking Cymbalta and Naproxen, both of which caused drowsiness. (R. 277).

In a Personal Pain Questionnaire also dated April 28, 2013, again assisted by his wife in completing, Plaintiff reported pain in his back right side, located in his mid- to lower back. (R. 278). Plaintiff described the pain as aching, stabbing, stinging, cramping, and throbbing, and lasting "all night & day, continuously." Id. Plaintiff reported tha "while resting on [the] couch,

29

the pain is bearable, but with any movement of my body the pain increase most time[s] unbearable." Id. Plaintiff's pain is made worse by "activity, even the smallest amount." Id. Resting on the couch and Naproxen help decrease Plaintiff's pain, but never completely relieve it. Id.

Plaintiff described his second pain in his buttocks as aching, stabbing, burning, stinging, cramping, and throbbing. (R. 279). Plaintiff reported that this pain is also continuous, and made worse by "any activity, moving or sitting." (R. 280). Resting on the couch helps decrease this pain but does not eliminate it. Id..

Plaintiff described his second pain in his right thigh into his right knee as aching, stabbing, throbbing, and lasting continuously. (R. 280). Resting on the couch helps decrease this pain to a "bearable" level, but does not eliminate it. Id. It is made worse by any amount of activity. Id.

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.   ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through September 30, 2016.

2.     The claimant has not engaged in substantial gainful activity since February 29, 2012, the alleged onset date (20 CFR 404.1571 et seq.).

3.     The claimant has the following severe impairments: degenerative disc disease of the cervical, thoracic and lumbar spine; residuals from right hernia repair; hypertension; (20 CIF'R 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed

impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.FR 404.1567(b) and 416.967(b) except the claimant is limited to unskilled work that does not involve lifting/carrying more than 20 pounds occasionally, 10 pounds frequently; standing and/or walking for more than a total of about 6 hours in an 8 hour workday; sitting for more than a total of about 6 hours in an 8 hour workday; unlimited pushing and/or pulling other than shown for lifting and/or carrying; no more than occasional balancing, stooping, kneeling, crouching, crawling, and climbing ladders/ropes/scaffolds/ramps/stairs; must avoid concentrated exposure to vibration, extreme cold and extreme heat; and must avoid even moderate exposure to hazards (machinery, heights, etc.).

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June 26, 2973 and was 38 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1559 and 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 15, 2010, through the date of this decision (20 CFR 404.1520(g)).

(R. 10-34).

# VI.   <u>DISCUSSION</u>

## A.   Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." <u>Hays</u>, 907 F.2d at 1456 (citing <u>Laws</u>, 368 F.2d at 642; <u>Snyder v. Ribicoff</u>, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

## B.   Contention of the Parties

Plaintiff presents a sole issue for consideration in his  Motion for Summary Judgment, asserting that the Commissioner's decision "is based upon an error of law and is not supported by substantial evidence." (Pl.'s Mot. at 1).  Specifically, Plaintiff alleges that the ALJ's pain

analysis and credibility findings were not in compliance with regulatory and case law. (Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 5, ECF No. 10). Plaintiff asks the Court to "remand this matter for the correction of errors made below." (Id. at 10).

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1). Specifically, Defendant alleges that "substantial evidence supports the ALJ's assessment of Plaintiff's credible limitations in work-related functioning." (Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 4, ECF No. 12).

**C.     Analysis of the Administrative Law Judge's Decision**

**1.   The ALJ's credibility determination**

The determination of whether a person is disabled by pain or other symptoms is a two-step process. Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1); SSR 96–7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment[3] capable of causing the degree and type of pain alleged. Craig, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ considers the credibility of the subjective allegations in light of the entire record. Id.

Social Security Ruling 96–7p, which sets out factors used to assess the credibility of an individual's subjective symptoms, including allegations of pain, was superseded by SSR 16-3p effective March 28, 2016.[4] The factors mentioned remain the same, however, including:

---

[3] Step one is fulfilled here. The ALJ in his decision stated that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . ." (R. 17). Thus, the Court addresses only Step Two.

[4] Federal Register Vol. 81, No. 51, page 14166, subsequently corrected by Federal Register Vol. 81, No. 57, page 15776; also published by SSA on their website, https://www.ssa.gov/OP_Home/rulings/di/01/SSR2016-03-di-01.html.

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

Id.

Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09cv55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets the basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08cv178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

A determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *4. However, in so doing, "An ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning. An ALJ's failure to consider an entire line of evidence falls below the minimal level . . ." Diaz v. Chater, 55 F.3d 300, 307 (7th Cir. 1995) (internal citation omitted).

As to credibility, the ALJ explained:

> After careful consideration of the evidence, the undersigned finds that the claimant' medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.
> While the claimant's complaints are extensive, his allegations are unsupported by objective and clinical findings, and are inconsistent with his conservative treatment, which medical records reflect, has been relatively successful in managing his symptoms.

(R. 15). Plaintiff contends that the ALJ's "explanation" falls impermissibly short of the regulations and precedent by failing to "build an accurate and logical bridge from the evidence to his conclusion" that Plaintiff was not entirely credible. (ECF No. 10 at 8, citing Monroe v. Colvin, 826 F.3d 176 (4th Cir. 2016)). The undersigned agrees, for multiple reasons.

First and foremost, the ALJ afforded "great weight" to two agency reviewers' opinions – Drs. Narendra Parikshak and Porfirio Pascasio (R. 21-22). The ALJ credited their RFCs, except that he disregarded their finding that Plaintiff needed to alternate sitting and standing "as it is not consistent with the evidence of record as a whole." (R. 21). Apart from this conclusory statement, however, the ALJ fails to explain how this is so, nor can the undersigned intuit how that might be. Notably, the ALJ fails to mention that both the initial *and* disability determinations based on these doctors' opinions explicitly *found Plaintiff to be credible as to his subjective complaints*. (R. 62, 87) (finding "the individual's statements about the intensity, persistence, and functionally limiting effects of the symptoms [were] substantiated by the objective medical evidence alone"). Yet, the ALJ does not appear to acknowledge - or explain why he disagrees with - *that* portion of the agency finding, despite otherwise giving them "great weight."

The ALJ's credibility determination largely consisted of a recitation of objective medical evidence. Of the seven factors articulated in 20 CFR 404.1529(c)(3), the ALJ discussed primarily daily activities and treatment. As to daily activities, the ALJ somewhat selectively cites

Plaintiff's ability to perform some limited daily activities as negating his claims. (R. 21). The ALJ further characterizes these activities as "rather significant activities of daily living." Id. No logical connection between Plaintiff's self-reported daily activities and such a characterization is apparent, nor does the ALJ's decision assist in that endeavor. The ALJ acknowledged that Plaintiff's "pain is exacerbated by lifting, carrying, sitting, standing, walking, climbing, bending, squatting, reaching, and kneeling." (R. 20). How the ALJ cited limited household chores, basic meal preparation, basic personal hygiene, driving a few times per month to doctor's appointments, and limited ability to care for his young daughter as contradicting those is not apparent, nor does he explain.

Plaintiff in fact explicitly stated that he tries to help with laundry, but cannot lift baskets of laundry nor take loads of laundry out of the washer or dryer, and is limited to some folding. (R. 254). He reported being unable to lift trash bags or vacuum. (R. 253). He reported that he "can not lift anything 10 lbs or more, cannot bend or twist" for risk of damaging the leads in his spine. (R. 252). He reported that he is limited to simple meal preparation because he could no longer lift heavy pots of boiling water for more substantial meals. (R. 254). He reported that his wife and son have to clean the cat's litter box and lift bags of cat food. (R. 253). He reported attempting to use a riding mower, but having to stop after a short time. (R. 50, 858). He reported that his daughter was becoming too heavy for him to pick up, and he could not lift her and her car seat. (R. 255). He reported that he does accompany his wife and son to the grocery store, but they have to lift the groceries. Id. Plaintiff's daily activities thus demonstrate that he largely avoids lifting carrying, climbing, bending, squatting, reaching and kneeling, and that he also limits sitting (R. 45, 257, 271, 280), and walking as well, reporting his leg swells when he walks too much. (R. 46, 349, 520). If there is any inconsistency between Plaintiff's activities of daily

living and his subjective complaints, it is not apparent from this record, and the ALJ has failed to provide any explanation. In absence of same, the only conclusion the undersigned can draw from this record is that it does not have even a scintilla of evidentiary support.

Further, such a conclusion is directly contrary to precedent. A claimant's daily activities are relevant evidence when assessing his alleged symptoms. See 20 C.F.R. § 404.1529. However, "[w]e have cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job *outside* the home." Louk v. Colvin, No. 2:16-CV-9, 2016 WL 7383814 at *22 (N.D. W.Va. Nov. 30, 2016) (citing Craft v. Astrue's, 539 F.3d 668, (7th Cir. 2008) quotation of Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006) (emphasis added)). Indeed, in contrast, the types of daily activities that negate credibility include significantly more demanding activities than the ones described by Plaintiff here. See Mastro v. Apfel, 270 F.3d 171 (4th Cir. 2001) (riding a bike, walking in the woods, and traveling to distant states without significant difficulty undermined claimant's subjective complaints of pain and fatigue); Meyer v. Astrue, 662 F.3d  700 (4th Cir. 2011) (driving, caring for horses and dogs, riding horses and operating a tractor was conflicting evidence); Kearse v. Massanari, 73 Fed.Appx. 601 (4th Cir. 2003) (cutting wood, mowing grass, and occasionally shopping contradicted a disability determination). Plaintiff's daily activities here, fairly considered, clearly are not of such caliber as to negate his credibility.

As to treatment, the ALJ - equally inexplicably - characterizes Plaintiff's treatment as conservative – when, as Plaintiff points out, Plaintiff underwent multiple surgeries when he *failed* numerous other conservative treatments. (ECF No. 10 at 8; R. 365) Statements such as "[Plaintiff's] allegations are . . . inconsistent with this conservative treatment, which medical records reflect, has been relatively successful in managing his symptoms" are, given this record,

puzzling.  There is no apparent logic to this conclusion whatsoever, given this extensive record of Plaintiff's ongoing attempts to obtain relief and the numerous treatments he has undergone and failed.  Plaintiff had to go through an extensive amount of screening and medical appointments in order to even obtain a spinal cord stimulator, which, while initially effective for a temporary period of time, had to be removed.  He underwent significant physical therapy, which was briefly helpful but ultimately failed as well, leading to a recommendation of more surgery.  Plaintiff underwent injections, which helped only temporarily.  (R. 419).  Plaintiff was unable to obtain nerve blocks, as his doctor recommended, but was denied insurance coverage.  Plaintiff has a long history of being prescribed strong pain medication, which even then did not completely relieve his pain.  He frequently rated his pain as a 5 or above on a scale of 1-10, and described his pain frequently as "very painful," (R. 427), "unbearable," and "constant." (R. 871).

As to medication, the ALJ selectively notes a single instance in February 2012 where Dr. Gopal noted that Plaintiff appeared to be in "mild pain" and prescribed Naproxen, which is an over-the-counter pain reliever. (R. 18). The ALJ fails to provide any explanation as to why he has found this lone instance persuasive or worthy of citation, in the face of hundreds of pages of medical records on many other days where Plaintiff repeatedly complained of more severe pain and incomplete relief from even stronger pain medication. For example, where a few months later, in June 2012, this same doctor noted the intensity of Plaintiff's pain had increased and was "very painful." (R. 427). Dr. Gopal recommended a spinal cord stimulator as medically necessary because Plaintiff "has undergone careful screening, evaluation, and diagnosis by a multidisciplinary team," had "average pain levels greater than 5," "intermittent or continuous pain causing functional disability," and "failure to respond to more conservative management treatments." Further, there is barely a mention of the numerous strong prescription pain relievers

that Plaintiff was frequently taking. Though Plaintiff experienced temporary relief after implant, records document his abdominal pain returned and he continued to seek treatment for that very issue – not only for continued abdominal pain (R. 811), but also for additional pain in his back, neck, and arm (R. 845-871). By May 8, 2014, Plaintiff reported 7 out of 10 pain at rest, and 9 out of 10 maximum pain; as well as continued "unbearable" pain and tingling, relieved only by sitting down and resting. (R. 871). There is thus no logical bridge from the evidence in this record to the ALJ's conclusions that can be ascertained, nor does he explain why he discredits vast contradictory medical evidence of record.

Indeed, the medications a claimant takes is relevant to a credibility determination regarding allegations of pain. Kearse, 73 Fed. Appx. at *603[5] (4th Cir. 2003) (taking only over-the-counter medications such as Tylenol and Motrin for pain supported finding that pain was not as severe as claimant alleged). Here, the record shows Claimant was repeatedly prescribed numerous strong pain medications including Hydrocodone (R. 285, 287, 381, 387), Hydromorphone (R. 374), Vicodin (R. 366, 381, 515, 520, 588), Lorcet (R. 417, 425, 440), Ultram/Tramadol (R. 427, 432, 455), Lidocaine injections (R. 441) and "multiple different pain medications" (R. 308) including Lyrica and Neurontin (R. 313). Hydrocodone is a prescription-strength Schedule II controlled substance and opioid pain medication designed to treat severe pain.[6] Plaintiff was also prescribed Cymbalta for both depression and to assist with pain relief.

---

[5] "In reaching his credibility determination, The ALJ found that although Kearse suffered from impairments that could cause some of the alleged symptoms, the objective medical evidence did not support the alleged severity. An extensive analysis of the objective medical evidence revealed that Kearse did not begin to complain of headaches until after filing his disability applications. Furthermore, there is no objective evidence in the record to support such complaints. Moreover, although Kearse testified that he had to be hospitalized approximately twice a year for such headaches, there is no such supporting documentation contained in the record. Kearse noted several times that he either took no prescription medication, or only samples that he received from the hospital. Instead, the record reveals that he took only Tylenol and Motrin for pain. See Shively, 739 F.2d at 989–90 (upholding the ALJ's finding that claimant's pain was not as severe as he alleged based partly on the prescribed medications of record)."

[6] Zohydro ER (hydrocodone bitartrate) – Drug Summary. Retrieved June 1, 2017 from Physicians' Desk Reference Online (PDR.net): http://www.pdr.net/drug-summary/Zohydro-ER-hydrocodone-bitartrate-3389.4565, noting that

(R. 305).  Hydromorphone (Dilaudid) is prescribed for moderate to severe pain.[7] Vicodin is a prescription-strength pain medication comprised of Hydrocodone and Acetaminophen, and designed to treat moderate to moderately severe pain.[8] Thus, the type of medications Plaintiff was prescribed supports Plaintiff's allegations of pain.

Taking only mild pain relievers, in absence of objective medical evidence to support allegations of pain, and in conjunction with daily activities that contradict those allegations, does not support a finding of disability. Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (Extra strength Tylenol and extra strength Excedrin, and a prescription analgesic intended for mild to moderate pain, did not sustain pain allegations alone without supporting objective medical evidence). Here, the record does indicate that Plaintiff took Naproxen and lesser pain relievers at times. However, Plaintiff's case is clearly distinguished from Shively because 1) Plaintiff was also prescribed Hydrocodone, Hydromorphone, Vicodin, Lorcet, and numerous other pain medications; 2) Hydrocodone  is designed to treat moderate to severe pain, unlike the prescription analgesic in Shively which was for mild to moderate pain; 3) the ALJ found that Plaintiff's allegations of pain were supported by objective medical evidence and could be caused by his conditions, whereas in Shively they were not; and 4) as discussed at length in this Report and Recommendation, Plaintiff's daily activities are significantly limited and do not contradict his allegations of pain. Thus, in this case, evidence regarding medications appear to fairly support only an inference that Plaintiff's pain was as severe as he alleged.

---

"Extended-release hydrocodone is not intended for use in the management of pain following surgery, acute pain, or on an as-needed basis; it is *intended only for patients requiring continuous, around-the-clock opioid analgesia for an extended period of time* and requires an experienced clinician who is knowledgeable in the use of long-acting opioids for chronic pain" (emphasis added).

[7] Dilauded (Hydromorphone hydrochloride) – Drug summary. Retrieved June 1, 2017 from Physicians' Desk Reference Online (PDR.net): http://www.pdr.net/drug-summary/Dilaudid-Liquid-and-Tablets-hydromorphone-hydrochloride-489.494#3.

[8] Physicians' Desk Reference 604 (PDR; 69th ed. 2015).

Relatedly, the undersigned also observes that Plaintiff was apparently diagnosed with fibromyalgia (R. 954). Though the deficient credibility analysis here requires remand entirely independent of this observation, it is apparent that this diagnosis, if supported, is highly relevant to a consideration of Plaintiff's subjective complaints of pain for the following reason. It is apparent that the ALJ appears to have been persuaded in no small part by Dr. Jorge Posada's notes on two occasions, both of which he made a point of citing in his decision. (R. 18).  The first, on October 7, 2011, noted that he was unable to determine any organic cause for Plaintiff's pain. (R. 84). Citing the second from May 16, 2012, the ALJ stated: "*Notably*, Dr. Posadas  . . . believed there was some component of secondary gain and that he had discharged the claimant form [sic] his office before and did not think the claimant needed to be seen again." (R. 18) (emphasis added).

The ALJ fails to explain why he (apparently) found these two brief comments, against significantly greater medical evidence to the contrary from numerous other physicians, more persuasive. Plaintiff saw Dr. Posada on a handful of occasions; he was not Plaintiff's primary care provider nor was he a treating specialist. Plaintiff's primary care provider, PA-C Kimmel, who he saw much more frequently, disagreed with Dr. Posada, as did a number of Plaintiff's treating specialists. PA-C Kimmel referred Plaintiff to Dr. Posada after an ultrasound on May 11, 2012 revealed an area of fluid collection, and Jong Kim, M.D. "recommend[ed] correlation to exclude infection." (R. 434). Thus, when Dr. Posada was dismissive of Plaintiff at that appointment, such a position was contrary not just to Plaintiff's concerns, but the concerns of *two* other physicians. (R. 320). Notably absent is any suggestion or indication that either of these two physicians' opinions on the matter were suspect in any way, though they were identical to the Plaintiff's.

Though Plaintiff's physicians have not been able to *conclusively* determine the source of his abdominal pain to a certainty as to which precise problem causes it, none of them – with the exception of Dr. Posada – doubt that Plaintiff's self-reported pain and symptoms are legitimate. None of his (numerous) treating physicians and specialists expressed any doubt as to the reality of Plaintiff's experience. Dr. Glenn Paule-Carres, Ph.D., explicitly stated that Plaintiff's responses "were indicative of a person being truthful and knowledgeable of his condition." (R. 313). Thus, the ALJ's failure to explain why he apparently credited two skeptical comments by a single doctor who saw Plaintiff rarely, and was neither a specialist nor his treating physician, in the face of vast medical evidence of record and opinions to the contrary (*including* the agency reviewers whom he afforded great weight), will not suffice.

This is especially so given that the National Institutes of Health (NIH) defines Fibromyalgia as a "chronic disorder characterized by widespread pain, diffuse tenderness, and a number of other symptoms . . . [that] can cause significant pain and fatigue, and . . . interfere with a person's ability to carry on daily activities . . . [it is] a medical condition that impairs the joints and/or soft tissues and causes chronic pain." Further, because "there are currently no diagnostic laboratory tests for fibromyalgia; *standard laboratory tests fail to reveal a physiologic reason for pain . . . some doctors unfortunately may conclude a patient's pain is not real, or they may tell the patient there is little they can do*." (emphasis added).[9] As such, this evidence is *highly* relevant to a proper credibility determination of this plaintiff's subjective complaints, given this record, and upon remand, should be taken into account and included in the explanation.

---

[9] See "Fibromyalgia," National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institutes of Health. July 2014. Available online at: https://www.niams.nih.gov/health_info/fibromyalgia/default.asp.

Accordingly, the undersigned finds that the ALJ's opinion is not supported by substantial evidence, as the credibility analysis lacks adequate explanation, and support for the ALJ's conclusions from those selective citations he has provided cannot be intuited. Not only does the ALJ's opinion lack an accurate and logical bridge from the evidence to his conclusions, it is difficult to discern so much as a logical footpath.

## VII.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is not supported by substantial evidence, nor does it suffice to permit meaningful review. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 9) be **GRANTED**, Defendant's Motion for Summary Judgment (ECF No. 11) be **DENIED**, and the decision of the Commissioner be **VACATED** and the case **REMANDED** under sentence four of 42 U.S.C. § 405(g) to the Commissioner for a new credibility analysis and new findings that are supported by substantial evidence consistent with the directives of this report and recommendation.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Gina M. Groh, Chief, United States District Judge.   Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted on June 1, 2017.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE